DECISION
Plaintiff Frank Kershaw appeals from a decision of the Rhode Island Department of Human Services (DHS), denying his application for Medical Assistance (MA). Jurisdiction is pursuant to G.L. 1956 § 42-35-15. For the reasons set forth below, the decision of the DHS is hereby remanded to DHS for further proceedings.
 FACTS AND TRAVEL
The Plaintiff is a morbidly obese forty-seven year old man who suffers from diabetes mellitus,[1] Charcot's joint disease in his right ankle,[2] hypertension,[3] as well as chronic and acute renal failure.[4] These conditions, among others, have led to bouts of depression and shortness of breath. He is 5'11 and weighs over 400 pounds. His weight has significantly compounded the symptoms attendant to his diabetes, renal failure, and neuropathic joint disease. In addition to this, his weight has, at times, prevented physicians from performing the requisite tests in measuring the severity of his conditions. Prior to his departure in July of 2003, Mr. Kershaw had worked as a funeral director for more than 20 years. In this capacity, the Plaintiff also performed work as an embalmer, regularly lifting over one hundred and fifty pounds.
The administrative records reflect that the Plaintiff's primary physician, Dr. Mechery J. Davis, treated Mr. Kershaw as early as October of 2001 for his diabetes, obesity, and renal conditions. A year later, in October 2002, Mr. Kershaw saw Dr. Nathalie A. Campbell for many of the same reasons. At the time, the Plaintiff was encouraged to continue taking the necessary medications to treat his diabetes, and was further encouraged to modify his diet and lifestyle to alleviate the growing problems accompanying his obesity. Dr. Campbell held subsequent follow-ups with Mr. Kershaw in both March and June of 2003. The records indicate that Mr. Kershaw was again advised to modify his diet, as well as his lifestyle, and that Mr. Kershaw was treated for depression.
At some time in mid-June of 2003, Mr. Kershaw slipped and fell in his bathtub, injuring his right ankle. As a result, he visited a litany of doctors, starting with Dr. Davis, his primary physician, and followed by Doctors Gallucci, Garrahan, and DiGiovanni. It was ultimately determined that the Plaintiff had not only fractured his right hind foot, but that he had Charcot's joint disease in his right ankle. He was instructed to keep his weight off his right ankle and to wear a protective boot. Dr. DiGiovanni confirmed the Charcot breakdown in his right ankle and hind foot with x-rays on July 31, 2003; a follow-up visit was conducted in December of 2003. Mr. Kershaw was advised to modify his job by moving to a sedentary position. On July 12, 2004, Mr. Kershaw saw Doctors Nelson Chu, Nathalie Campbell, and Merchery Davis after entering the emergency room for fever and chills. These visits focused primarily on the Plaintiff's chronic renal insufficiencies and acute renal failure. Lab tests were conducted on the Plaintiff's urine and blood.
On June 18, 2004, about a month prior to this emergency room visit, the Plaintiff filed an application for Medical Assistance. DHS assigned the application to its Medical Assistance Review Team (MART), which determined that he was not disabled and not eligible for Medical Assistance. Written notice of the denial of MA was provided on September 3, 2004.
On September 13, 2004, the Plaintiff filed a request for an administrative hearing, which was held on October 21, 2004. Subsequent to the hearing, the record was left open for forty-five days, until December 7, 2004, to allow the Plaintiff to submit any additional medical records. Additional medical records were submitted, and the record was then left open for an additional seven days, until December 14, 2004, allowing time for MART and the Hearing Officer to review the newly submitted materials. These materials included the July 2004 lab data and reports conducted by Doctors Chu, Campbell, and Davis. The Hearing Officer issued a final written decision on January 14, 2005, concluding that Mr. Kershaw was not disabled, and therefore not eligible for Medical Assistance. Twenty-one days later, the Plaintiff filed a timely appeal with this Court on February 8, 2005.
 STANDARD OF REVIEW
Review of an agency decision by the Superior Court is governed by the Administrative Procedures Act, G.L. 1956 §§42-35-1 — 42-35-18. The standard of review is set forth at §42-35-15(g):
 The Court shall not substitute its judgment for that of the agency as to the weight of the evidence on the questions of fact. The court may affirm a decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Pursuant to that standard, this Court sits as an appellate tribunal when considering agency decisions. Mine SafetyAppliances Co. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). The Court's review is based on the certified record, which is examined to determine whether the decision below is supported by any legally competent evidence. Johnston Ambulatory SurgicalAssociates, Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000). As long as "substantial evidence" exists to support the agency's determination, the Superior Court must uphold the decision.Center for Behavioral Health v. Barros, 710 A.2d 680, 684 (R.I. 1998). The Rhode Island Supreme Court has defined substantial evidence as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." NewportShipyard, Inc. v. Rhode Island Commission for Human Rights,484 A.2d 893, 897 (R.I. 1984) (quoting Caswell v. George ShermanSand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). Absent clear error, the Court ordinarily will not substitute its judgment for that of the agency with respect to credibility or weight of the evidence. Barros, 710 A.2d at 684. Furthermore, questions of law are not binding upon the court and are reviewed de novo.Narragansett Wire Co. v. Norberg, 118 R.I. 596, 376 A.2d 1, 6
(R.I. 1977); Bunch v. Bd. of Review, 690 A.2d 335, 337 (R.I. 1997).
 ELIGIBILITY FOR MEDICAL ASSISTANCE
Medical assistance benefits are provided under a federally funded program that is part of the federal Social Security Act.42 U.S.C. § 1396 (2005). The DHS administers the program on a statewide level in Rhode Island. Tierney v. Dep't of HumanSvcs., 793 A.2d 210 (R.I. 2002). Participating states must comply with the federal Act and its regulations. Schweiker v.Gray Panthers, 453 U.S. 34 (1981). In Rhode Island, the DHS determines whether individuals are eligible for benefits by applying Social Security guidelines promulgated at 20 C.F.R. §§ 416.901-416.998.
For an individual to qualify as "disabled," the person must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 416.909; DHS Manual § 0352.15;see also, 42 U.S.C. § 1382c (a)(3). A five-part inquiry is employed in each case:
 1. Is the claimant engaged in substantial gainful activity?
 2. If not, is the impairment severe?
 3. If severe, does it meet or equal an impairment listed in the Supplemental Security Income (SSI) regulations?
 4. If it does not meet or equal SSI regulations, does the impairment prevent the claimant from doing past relevant work?
 5. Considering age, education, work experience and residual functional capacity, does the impairment(s) prevent the claimant from doing other work in the national economy? 20 C.F.R. § 416.920(a)(4).
The claimant bears the burden of proof as to the first four steps; at step five, the burden shifts to the agency to demonstrate that the claimant can perform work in the national economy other than his or her past relevant work. See Pope v.Shalala, 998 F.2d 473, 477 (7th Cir. 1993). Because of the sequential nature of this five-pronged analysis, a negative determination at any one of the steps (except for step three) forecloses a finding of "disabled." See Seavey v. Barnhart,276 F.3d 1, 5 (1st Cir. 2001) (observing that "[a]ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process."); McDaniel v. Bowen,800 F.2d 1026, 1030 (11th Cir. 1986).
The first two stages of the five-part evaluation are not in dispute: Mr. Kershaw is not presently working and has not worked since July of 2003, and the DHS Hearing Officer concluded that the disability is severe. Likewise, the last two stages of the five-part evaluation are unchallenged: Mr. Kershaw is unable to perform his past work as a funeral director and embalmer, but he is able to perform other work in the national economy. The parties disagree at stage three.
 HEARING OFFICER'S DETERMINATION THAT PLAINTIFF IS NOT DISABLED AT STAGE THREE
In essence, the Plaintiff contends that the Hearing Officer clearly erred at stage three of the disability determination process by incorrectly assessing the SSI regulations as provided in 20 C.F.R. pt. 404, subpt. P, 1 (2005). Specifically, the Plaintiff asserts that there is substantial evidence on the record to support a finding of disability as listed by the musculoskeletal, neurological, endocrine, and genito-urinary listings.
The Plaintiff claims that he meets or equals listing 1.02(A) for musculoskeletal disability and that the Hearing Officer clearly erred in making the assessment. See 20 C.F.R pt. 404, subpt. P, app. 1, 1.02(A). Listing 1.02(A) requires that there be a major dysfunction of one of the "major peripheral weight-bearing joints (i.e., hip, knee, or ankle)," which results in the inability to ambulate effectively. Ineffective ambulation is defined as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, 1.00(B)(2)(b)(1). Thus, at the very least, to meet the musculoskeletal listing, a petitioner for Medical Assistance must not be able to ambulate effectively without the use of two canes, crutches, or other such devices that limit the functioning of both arms. Although Mr. Kershaw at times uses a cane and wears a protective boot on his right ankle, there is no evidence in the record that suggests the Plaintiff employs any devices which limit the function of both his upper extremities while walking.[5] In particular, Mr. Kershaw testified that he drove to the disability administrative hearing on his own, and that he was able to walk from his car to the hearing without the use of crutches or two canes. (Exhibit 14 at 9.) Likewise, the Plaintiff wrote on his application for disability that he was able to "get around" alone, without the use of a walker, cane, wheelchair, crutches, or other personal help. (Exhibit 8 at 3.)
The Plaintiff also claims the he meets or equals the neurological impairment listed at 20 C.F.R pt. 404, subpt. P, app. 1, 11.14. A petitioner for Medical Assistance can be determined at stage three to meet or equal listing 11.14, if he or she has a peripheral neuropathy[6] characterized by a significant and persistent disorganization of motor function in two extremities which presents itself in the form of paralysis, tremors, or other involuntary movements. Compare 20 C.F.R pt. 404, subpt. P, app. 1, 11.14 (giving the basic neurological requirement), with 20 C.F.R. pt. 404, subpt. P, app. 1, 11.04(B) (defining disorganization of motor function as a sustained disturbance in two extremities), and 20 C.F.R. pt. 404, subpt. P, app. 1, 11.00(C) (specifying the physical manifestation of the disorganized motor function). The Plaintiff neither alleges nor does the record reflect any neurological impairment which causes disorganization of Mr. Kershaw's extremities in the form of paralysis, tremors, or other involuntary movements. Accordingly, the Hearing Officer did not clearly err with respect to this listing.
Lastly, the Plaintiff claims that the Hearing Officer clearly erred because there is substantial evidence that supports a finding of disability under 20 C.F.R. pt. 404, subpt. P, app. 1, 9.08(A), 6.02, and 6.06. Listing 9.08(A) requires a showing of diabetes mellitus in combination with a persistent disorganization of two extremities which results in a "sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. pt. 404, subpt. P, app. 1, 9.08(A). Again, this gross disturbance of movement or gait is defined as manifesting itself through debilitating paralysis, tremors, or involuntary movement. See 20 C.F.R. pt. 404, subpt. P, app. 1, 11.00(C). And, again, the record does not reflect that the Hearing Officer clearly erred in making a negative determination as to this listing. In short, the DHS did not have before it evidence that Mr. Kershaw suffers from paralysis, tremors, or involuntary movement which cause persistent disorganization of two of his extremities.
The disputed genito-urinary listings, 6.02 and 6.06, describe impairments due to renal failure and nephrotic syndrome.[7]
Listing 6.02 permits a finding of disability if there is an "[i]mpairment of [the] renal function, due to any chronic renal disease expected to last 12 months" with "chronic hemodialysis[8] or peritoneal dialysis[9]
necessitated by irreversible renal failure," "kidney transplant," or "persistent elevation of serum creatinine in to 4 mg. per deciliter (100 ml.) or greater or reduction of creatinine clearance to 20 ml. per minute (29 liters/24 hours) or less, over at least 3 months." 20 C.F.R. pt. 404, subpt. P, app. 1, 6.02(A)-(C). Listing 6.06 requires that an individual have "nephrotic syndrome, with significant anasarca,[10]
persistent for at least 3 months despite prescribed therapy," with "[s]erum albumin of 3.0 gm. per deciler [sic] (100 ml.) or less and protenuria [sic] of 3.5 gm. per 24 hours or greater," or "[p]roteinuria of 10.0 gm. per 24 hours or greater." 20 C.F.R. pt. 404, subpt. P, app. 1, 6.06(A)-(B).
In 2001, Dr. Campbell wrote in a report that the Plaintiff's proteinuria was severe. (Exhibit 9.) Subsequent reports listed the Plaintiff's total proteinuria at 6.9 gm. in February of 2004, 7.2 gm. in November of 2003, and 6.1 gm. in March of 2003; these reports also listed his serum albumin levels at 4.1 gm. in February of 2004, 3.8 gm. in November of 2003, and 3.3 gm. in March of 2003. (Exhibit 12.) Thus, at these times, although Mr. Kershaw had the requisite proteinuria levels, he did not have the necessary serum albumin levels which would meet or equal listings 6.02 or 6.06.
Several months later, however, in a consultation dated June 15, 2004 from Kent County Memorial Hospital, the section titled "Laboratory Data" lists that Mr. Kershaw's albumin level was 2.1 gm. (Exhibit 12.) Likewise, in July of 2004, Mr. Kershaw visited Dr. Nelson Chu to check the status of his renal conditions; in that report Dr. Chu noted that his total urinary protein for tests performed in June of 2004 showed he had a one day total of 18.7 gm. of urinary protein, nearly twice the level necessary to meet listing 6.06. Although the earlier measurements did not equal these genito-urinary listings, these most recent reports list protein levels and albumin levels that meet the requirements of these genito-urinary SSI listings.
When record findings are not developed sufficiently, the Superior Court has the authority to remand a case "to correct deficiencies in the record and thus afford the litigants a meaningful review." Lemoine v. Dept. of Mental Health,Retardation Hosps., 113 R.I. 285, 290, 320 A.2d 611, 614
(1974) (holding that remand was appropriate where the agency may have acted on incomplete or inadequate information or failed to give adequate consideration to certain evidence). In this case, the Hearing Officer has failed to provide an adequate record. In the administrative decision, the Hearing Officer simply stated that "[t]he record in this matter does not contain evidence to establish that any of the appellant's medical impairments are at a listing level severity." (Exhibit 13 at 5.) This unsubstantiated conclusion does little to address the SSI listings discussed in this decision. In particular, the Hearing Officer fails to record whether she took into account the most recent blood and urinary tests submitted by the Plaintiff, and why the Plaintiff did not meet listings 6.02 or 6.06. Accordingly, the Hearing Officer's decision is inadequate and, thus, arbitrary and capricious.
 CONCLUSION
After a review of the entire record, including medical assessments by Plaintiff's treating physicians, findings of the MART, and the testimony of Plaintiff at the administrative hearing, this Court finds the decision of the Hearing Officer to be unsupported by reliable, probative, and substantial evidence. The Hearing Officer fails to explain the conclusions she reached at stage three. Specifically, the Hearing Officer neglected to detail her reasoning as to why Mr. Kershaw did not meet SSI listings 6.02 and 6.06. The substantial rights of Plaintiff have been prejudiced. Accordingly, the decision of the DHS is remanded to the DHS for a determination of findings of fact and application of the facts to the relevant regulations herein specified and pursuant to G.L. § 42-35-12. This Court shall retain jurisdiction.
Counsel will prepare an appropriate order for entry.
[1] Diabetes mellitus is a "complex disorder of carbohydrate, fat, and protein metabolism that is primarily a result of a relative or complete lack of insulin secretion by the beta cells of the pancreas or of defects of the insulin receptors." MOSBY'S MEDICAL, NURSING, ALLIED HEALTH DICTIONARY 361 (3d ed. 1990).
[2] Charcot's joint disease, or neuropathic joint disease, is defined as "a chronic, progressive, degenerative disease of one or more joints, characterized by swelling, instability of the joint, hemorrhage, heat, and atrophic and hypertrophic changes in the bone. . . . The disease is the result of an underlying neurologic disorder, such as tabes dorsalis from syphilis, diabetic neuropathy, leprosy, or congenital absence or depression of pain sensation. . . . Surgical reconstruction is not usually effective because healing is slow. Amputation may be necessary."Id. at 809.
[3] Hypertension is defined as a "common, often asymptomatic disorder characterized by elevated blood pressure. . . . Persons with mild or moderate hypertension may be asymptomatic or may experience suboccipital headaches, especially on rising, tinnitus, lightheadness, easy fatigability, and palpitations. With sustained hypertension arterial walls become thickened, inelastic, and resistant to blood flow, and, as a result, the left ventricle becomes distended and hypertrophied in its efforts to maintain normal circulation." Id. at 590-91.
[4] Renal failure is "the inability of the kidneys to excrete wastes, concentrate urine, and conserve electrolytes. The condition may be acute or chronic." Id. at 1018.
[5] There is evidence that in July of 2003, Dr. DiGiovanni recommended a short leg cast and the use of crutches and a walker in order to keep weight off of his damaged right ankle. This recommendation does not, however, demonstrate that the hearing officer's decision was clearly erroneous. As noted supra, there is a substantial amount of evidence detailing Mr. Kershaw's ability to statutorily ambulate effectively, and there is no evidence suggesting that the Plaintiff actually walks with the use of two canes, crutches, or other such devices that limit the use of both arms.
[6] Peripheral neuropathy is defined as any functional or organic disorder of the motor and sensory nerves and ganlia outside the brain and spinal cord. MOSBY'S, supra note 1, at 903.
[7] Nephrotic syndrome is "an abnormal condition of the kidney characterized by marked proteinuria, hypoalbuminemia, and edema. . . . The presenting symptoms include anorexia, weakness, proteinuria, hypoalbuminuria, and edema." Id. at 803.
[8] Hemodialysis is a "procedure in which impurities or wastes are removed from the blood, used in treating renal insufficiency and various toxic conditions." Id. at 555.
[9] Peritoneal dialysis is a "procedure performed to correct an imbalance of fluid or of electrolytes in the blood or to remove toxins, drugs, or other wastes normally excreted by the kidney."Id. at 904.
[10] Anasarca is a generalized, massive edema that is often observed in swelling associated with renal disease when fluid retention continues for an extended period of time. Id. at 61.